# Exhibit A

## **DECLARATION OF SPECIAL AGENT BYRON ANDERTON**

I, Special Agent Byron Anderton, declare:

1. I am a Special Agent with Homeland Security Investigations ("HSI"). I am currently serving in the Phoenix Field Office, Financial Crimes Unit. I have been employed as a federal agent for over eleven (11) years. I have conducted numerous criminal investigations involving violations of Immigration and Customs law committed against the United States, such as financial crimes, weapons violations, narcotics violations, document and benefit fraud, and human smuggling. Also assigned to this investigation is a Special Agent with the United States Treasury Department, Internal Revenue Service (IRS), specializing in tax law violations and other various financial investigations. I am familiar with the investigation leading up to the Indictment in this case.

2. This declaration is submitted in support of the government's request for pretrial detention of Yomtov Scott Menaged ("Menaged"). The following is information based on my personal observations, the observations of other federal and state law enforcement officers, and a review of records and evidence obtained through search warrants and subpoenas. If called upon, I could competently testify as set forth below:

### Background

3. Yomtov Scott Menaged ("Menaged") is a real estate investor and the owner of furniture stores operating under the names Furniture King, Furniture and Electronic King, Scott's Fine Furniture, and American Furniture. All of the stores are located throughout the Phoenix metropolitan area.

4. Menaged has used multiple variations of his name including: Scott Yomtov

1

Menaged; Scott Menaged; Yomtov Menaged; Yomtov F. Menaged; Yomtov Jr. Menaged, among others, to conduct financial and business transactions. In addition, Menaged has utilized multiple Social Security Numbers including his validly issued number and at least one additional Social Security Numbers to conduct transactions. Menaged has also utilized at least two separate dates of birth to conduct transactions including his valid date and at least one other date of birth.

## Bank Fraud

5. Beginning in 2015, Menaged entered into agreements with Wells Fargo and Synchrony Financial to open merchant credit accounts that allowed Menaged, through his furniture stores, to offer lines of credit to his customers for in-store furniture purchases.

6. In February 2016, Wells Fargo discovered unusual activity associated with the Wells Fargo Bank Furniture King merchant account. Wells Fargo recognized that when a customer would establish their initial credit line, usually $3,000-5,000, a request was subsequently made from the furniture store to raise the credit line as high as $15,000 for the initial purchase. This is unusual as Furniture King is a low-priced furniture store.

7. A review of the supposed furniture store customers' names and dates of birth indicated that the customers were recently deceased (in most cases within days prior to establishing the credit line). In addition, the personal identification information associated with the fraudulent activity was valid and accurate information for each recently deceased individual indicating that Menaged, and others working with him, had the ability to obtain Social Security Numbers and other personal identification information in bulk.

8. The handwriting for each of the customers on the applications and the identification

documents such as signatures on the drivers' licenses appeared similar and in most cases appeared altered. The photos on several of the identification documents were used multiple times on different credit applications. The total financial loss to Wells Fargo is approximately $1,199,900.00.

9.  In September 2016, Synchrony Financial experienced a similar fraud as the Wells Fargo fraud described above. A complete review of the various furniture stores associated with Menaged revealed that Menaged and others had established at least four merchant accounts with Synchrony Financial that were used primarily for fraudulent transactions. Again, it was verified that the credit applications were established in the names of recently deceased individuals or elderly individuals and that the personal identification information utilized was accurate. The total financial loss to Synchrony Financial is approximately $842,369.75.

International Travel

10. Menaged is a U.S. Passport holder and has engaged in overseas travel to include Israel, Jamaica, Mexico, Australia, and Canada. Menaged has utilized at least two passports and as recently as 2015 requested a new passport (XXXX-7503) to replace passport (XXX-3992) he claimed to have lost in Scottsdale, AZ. At the time of his arrest, Menaged had U.S. passport cards for himself and his wife in his wallet. An additional passport booklet for Menaged was found at his American Furniture store.

- On or about December 6, 2015, Menaged departed George Bush Intercontinental Airport in Houston, Texas in route to Sangster International Airport in Montego Bay, Jamaica. On or about December 9, 2015, Menaged departed Sangster International

Airport, Montego Bay, Jamaica to Miami International Airport, Miami, Florida.

- On or about May 25, 2013, Menaged departed Orlando Melbourne International Airport, Florida in route to Beauharnois, Quebec, Canada. On or about June 1, 2014 Menaged returned from Beauharnois Quebec, Canada to Orlando, Florida.

- On or about March 24, 2012, Menaged departed JFK International Airport New York in route to Ben Gurion Airport, Israel. On or about March 31, 2012, Menaged departed Ben Gurion Airport, Israel to JFK International Airport, New York.

- On or about August 15, 2011, Menaged departed Orlando Florida in route to Yandicoogina WA, Australia. On or about August 20, 2011, Menaged departed Yandicoogina WA, Australia to JFK International Airport, New York.

- On or about April 3, 2010, Menaged entered the United States through vehicle primary lanes at Lukeville, AZ Port of Entry from Mexico.

- On or about December 27, 2009, Menaged departed John Wayne Airport, Orange County, CA in route to Bayside, New Brunswick, Canada. On or about January 3, 2010, Menaged departed Bayside, New Brunswick, Canada to Los Angeles, CA.

- On or about March 20, 2009, Menaged departed Long Beach, CA in route to Bayside, New Brunswick, Canada. On or about March 23, 2009, Menaged departed Bayside, New Brunswick, Canada to Long Beach, CA.

- On or about December 16, 2007, Menaged departed Orlando Melbourne International Airport, Florida in route to Yandicoogina WA, Australia. On or about December 20, 2007, Menaged departed Yandicoogina WA, Australia to Orlando

Melbourne International Airport.

Finances

11.     Menaged has signatory authority and control over at least twenty-eight (28) separate bank accounts with at least five (5) different financial institutions that the investigation is presently aware off. Menaged uses all of the bank accounts interchangeably, routinely transferring funds amongst the various bank accounts.

12.     On or about April 20, 2016, Menaged filed for Chapter 7 bankruptcy protection with the U.S. Bankruptcy Court in the District of Arizona. As of April 4, 2017, approximately $132,241,306.00 in claims were registered against Menaged. Included in the claims are approximately $1,491,498.00 in secured claims and $130,749,808.00 in unsecured claims. In the most recent amended filing, Menaged listed $3,253,659.36 in unsecured debts, of which $225,644.00 and some "unknown" amount is owed to DENSCO. DENSCO was identified as a Chandler, AZ based hard-money lender utilized by Menaged in real estate purchase transactions.

13.     Between January 2013 through June 2016, Menaged obtained approximately 2,712 loans from DENSCO totaling approximately $734,484,440.67. Of the 2,712 loans made by DENSCO, less than 100 real estate transactions were conducted by Menaged as contemplated by the loan agreements. Menaged used newer loans from DENSCO to pay interest on prior loans, but the investigation determined that the majority of the loaned funds were syphoned off and embezzled by Menaged. For example, between February 13, 2015 through October 1, 2015, DENSCO wired a total of $133,087,329.85 from its' 1st Bank account ending in #5264 to JP Morgan Chase account ending in #1151, an account

owned and operated by Menaged. Menaged ultimately embezzled approximately $47,156,641.92 in fraudulent proceeds a large portion of which was traced to bank accounts owned and controlled directly by Menaged.

14. On or about July 2016, Menaged bragged in a secret recording made by DENSCO's principal, that he (Menaged) had approximately $30,000,000.00 in an offshore trust account. During the conversation, Menaged stated that he would never tell the Bankruptcy Court about the account. In addition, Menaged discussed hiding money with other banks, under unknown names. Menaged stated that he was waiting for his bankruptcy to be finalized before accessing the $30,000,000.00 and that he would then repay DENSCO.

15. The investigation determined that Menaged has wired or electronically transferred millions of dollars to bank accounts in the names of friends and family members.

- Between 2013 and the present, Menaged transferred by wires and checks approximately $5,300,000.00 traceable to proceeds from DENSCO to an account at Bank of America controlled by a close friend and associate of Menaged. Once the funds were transferred by Menaged to his associate, the funds were used to pay Menaged's personal and business expenses.

- Between 2015 and the present, Menaged transferred approximately $1,033,808.28 to a Bank United account held in the name of his father. Menaged's father is a United States citizen born in Israel and derived his United States citizenship from his parents. On or about July 25, 2016, Menaged's father sent an International wire in the amount of $200,000.00 to Israel Discount Bank for the benefit of N.S.H. On July 24, 2016, the balance in the United account was approximately $2,403,673.15.

N.S.H. is believed to be a family member of Menaged. This international wire occurred in and around the time the secret recording was made by DENSCO's principal in which Menaged claims that he has access to offshore funds.

- In addition, as described above, once DENSCO wired money to accounts controlled by Menaged, Menaged frequently immediately wired funds to his father's accounts. For example, between February and October 2015, of the $133,087,329.85 DENSCO wired from its' 1st Bank account ending in #5264 to Menaged's JP Morgan Chase account ending in #1151, Menaged wired $709,405.40 to his father's United account ending in #0927.

16. Menaged also has access to credit cards in the names of other individuals. At the time of his arrest, an American Furniture Bank of America credit card in the name of Menaged's sister was found in Menaged's wallet.

17. In addition to transferring large amounts of money electronically through accounts he controls, Menaged also has access to significant amounts of cash.

- On or about February 2, 2016, Menaged entered a JP Morgan Chase Bank located on Shea Blvd. Scottsdale, AZ with $3,000.00 in cash. Menaged proceeded to purchase eight (8) sequential money orders made payable to Wells Fargo Finance as captured on JP Morgan video surveillance. Listed on the sender line of each cashiers' check was a recently deceased defrauded customer's name. Menaged then mailed the cashiers' checks he purchased to Wells Fargo to avoid the immediate default of the fraudulent credit accounts presumably to prevent detection of the underlying fraud by the bank.

- On May 24, 2017, when Menaged was arrested pursuant to the warrant he was carrying approximately $2,511.00 in cash, of which $1,400.00 consisted of 14 uncirculated $100 bills.

18. The investigation further determined that Menaged utilized cash and frequented casinos where he cashed in or took out large amounts of cash.

- Between October 21, 2014 and June 29, 2016, Menaged and his wife had at least twenty-six (26) tracked visits to Wild Horse Pass Casino in Chandler, Arizona. A tracked visit is when a player uses a player's card to access a machine and their play is registered. A player is not required to use their player card to access the machines.
- During the above referenced time, approximately forty-five (45) currency transaction reports (CTR) have been filed. A CTR is filed when a player exceeds $10,000 cash in or cash out during a single visit.
- The combine cash out total since 2014 is approximately $1,467,014.00.
- The majority of the registered play associated with the player's cards had been through the use of slot machines. Slot jackpot payouts are exempt from CTR reporting.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief. Executed this 31st day of May 2017 in Phoenix, Arizona.

Byron Anderton
Special Agent
HSI

8